UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10201-RGS

DONNA MARIE DUMONT LAVALLEE

v.

MICHAEL J. ASTRUE, COMMISSIONER OF
SOCIAL SECURITY

MEMORANDUM AND ORDER ON
APPELLANT'S MOTION TO REVERSE
AND APPELLEE'S MOTION TO AFFIRM
THE DECISION OF THE COMMISSIONER

June 11, 2010

STEARNS, D.J.

Donna Marie Dumont Lavallee seeks review of the final decision of the

Commissioner of the Social Security Administration (SSA), adopting an Administrative Law

Judge's (ALJ) decision finding that she is not disabled. Lavallee asserts that the ALJ erred

in rendering his opinion by: (1) failing to give appropriate weight to the opinions of her

treating physician(s); (2) giving too much credence to the opinion of a consultative

examiner; and (3) determining that her subjective complaints were largely not credible and

inconsistent with the medical evidence.  The Commissioner moves for affirmance.

BACKGROUND

Administrative Proceedings

On November 27, 2006, Lavallee filed applications for Disability Insurance Benefits

(DIB) and Supplemental Security Income (SSI) benefits.[1]  Lavallee's claimed onset date

_____

[1]This court's review of Lavallee's Title II application for DIB is authorized by 42
U.S.C. § 405(g).  The review of Lavallee's Title XVI application for SSI benefits is

of disability was March 20, 2006.  Trial Record (Tr.) at 79.  The applications were denied

initially on July 9, 2007, and at an administrative review on February 11, 2008.  Lavallee

requested a hearing before an ALJ.  A hearing was convened by ALJ Alan Mackay on July

8, 2008.  Lavallee was represented by counsel, and Lavallee's wife was present.  Lavallee

and a vocational expert testified.  Tr. at 8.

The ALJ issued his decision on August 13, 2008, affirming the denial of Lavallee's

application for benefits.[2]  Tr. at 76-88.  The ALJ found Lavallee not to suffer a disability as

defined by the Social Security Act.  On November 12, 2008, the SSA Decision Review

Board affirmed, thereby adopting the ALJ's decision as that of the Commissioner.

Personal History

Lavallee was born in April 1960, and is currently 50 years old.  She was born

intersexual, having both male and female biological characteristics.  While Lavallee was

raised as a male, she personally identifies with being female.[3]  She reports that in her

youth, she endured physical and sexual abuse in her family home, from which she was

eventually removed and placed in foster care. Lavalee is on hormone replacement therapy

and desires gender corrective surgery, but is unable to afford it.

---

authorized by 42 U.S.C. § 1383(c).

[2]At the hearing, the ALJ determined that Lavallee was incapable of performing any of her past relevant work as a heavy equipment operator, tractor trailer driver, landscape laborer, blasting specialist, or security guard. Tr. at 86. However, the ALJ found that there were jobs in significant numbers in the national economy that Lavallee could perform given her age, education, experience, and residual functional capacity (RFC). Id.

[3]Consistent with Lavalee's preference and practice, the court will refer to her using the feminine gender.

Lavallee completed high school in 1978. She was a member of the Army Reserve from May 1978 through April 1985, and served in the Coast Guard Auxiliary from 1996 to 1999. Lavallee has worked as a heavy equipment operator, landscaper, and most recently, as a truck driver (until March 20, 2006). Tr. at 20-27. Lavallee contends that the combined effects of her psychological symptoms and the pain caused by her physical impairments prevent her from working on a regular basis.

Lavallee's claimed physical impairments include fibromyalgia muscle pain affecting her neck, shoulders, arms, back, feet, ankles, and legs; chronic fatigue syndrome; bilateral osteoarthritis in her knees; a radial tear of the medial meniscus in the left knee with early medial compartment degenerative changes; varus deformity with a medial meniscus tear in the right knee; and non-symptomatic carpal tunnel syndrome. Lavallee's listed mental impairments are post traumatic stress disorder; depression with suicidal ideation; and anxiety with associated agoraphobia.

Medical Treatment

Lavallee treated with Dr. Jeanne Mase until approximately January of 2007, and Nurse Practitioner (NP) Susan Roderick to the date of the hearing.[4] The administrative record also contains MRI's of Lavallee's knees taken in January of 2007.[5] Regarding her mental health, the administrative record consists of the treatment records of Susan Livingston, a licensed social worker. Tr. at 260-267. The record also contains reports

_____

[4]Lavallee did not have health insurance until January of 2007. Tr. at 34-35. As a result, she was unable to sustain medical treatment on a regular basis in 2006 and 2007.

[5]Lavallee testified at the administrative hearing that she saw a Dr. Benoit for her knee pain, but the administrative record is silent on the issue. Tr. at 34.

from four consultative experts.  She was evaluated by two medical doctors – Dr. John Howard and Dr. M.A. Gopal, and by two psychologists – Jeffrey Twarog and Carol McKenna.

Insofar as relevant to her disability claim, the record reveals that on May 3, 2006, Lavallee presented at the emergency room at Cape Cod Hospital complaining of left leg pain.  Tr. at 193.  The emergency room physician, Dr. Craig Cornwall, noted that Lavallee was taking Oxycodone and Motrin, although the medications were not providing relief.  Tr. at 193.  Dr. Cornwall observed that Lavallee was not in acute distress, her back was not tender, her legs had no focal swelling or deformity, and her neurovascular function and mentation (thinking process) were good.  Tr. at 193.  Dr. Cornwall suggested that Lavallee apply ice to the affected areas and take Prednisone, an anti-inflammatory immunosuppressant.  Id.

On December 28, 2006, Dr. Mase diagnosed Lavallee with chronic changes consistent with osteoarthritis in her knees, including bony crepitus (the crunching of bone on bone), and limited range of motion.  Tr. at 214.  Dr. Mase also noted in renewing Lavallee's Oxycodone prescription that it was "much more important" for her to use NSAIDs (non-steroidal anti-inflammatory drugs) to prevent damage to her joints.  Id.  Lavallee continued on Oxycodone for another year.  Tr. at 291-302.

On January 12, 2007, the MRI's revealed a tiny medial meniscus tear in Lavalee's right knee, and a large radial tear of the medial meniscus with early medial compartment degenerative changes in her left knee.  Tr. at 228-229.  On June 14, 2007, Dr. Howard examined Lavallee at the request of Disability Determination Services (DDS).  Lavallee

complained mainly of fatigue.  Her gait was normal, she had no difficulty getting on and off

the examination table, her lungs were clear, and her cardiac signs were normal.  Tr. at

239-240.  Dr. Howard found that Lavallee had no calf tenderness or ankle edema; her

joints were stable; she had no bony crepitus in her knees; there was no evidence of active

synovitis (inflammation of the lining of the joint) or muscle tenderness; and her muscle

strength, range of motion, and grip strength were normal.  Tr. at 240.

On July 6, 2007, Dr. Gopal (who did not conduct a physical examination) completed

a Physical RFC Assessment form based on Lavalee's medical records.  Tr. at 243-250.

Dr. Gopal determined that Lavallee could frequently lift ten pounds, occasionally lift twenty

pounds, and sit and stand/walk for at least six hours during an eight-hour day.  Tr. at 244.

On January 12, 2008, Lavallee had her first appointment with NP Roderick.

Roderick found that Lavallee was in no acute distress, her lungs were clear, and she had

no edema in her extremities.  With regard to Lavallee's mental state, Roderick found her

mood and affect normal.  While on April 25, 2008, Lavalle reported "severe neck pain,

palpitations, [and] . . . depression," Roderick observed that Lavallee's neck had "normal

range of motion [and] nontender sensation to light touch"; her back and spine were

unremarkable; and her joints, motor strength, coordination, and gait were normal.  She

also found Lavalee's heart "PMI [apical pulse], rate and rhythm" to be "normal." Tr. at 286.

Roderick reported Lavalee's "mental status" as "[a]lert and oriented [t]o person, place and

time. Mood/Affect normal." On June 20, 2008, NP Roderick completed a "Medical Source

Statement of Ability to Do Work-Related Activities (Physical)." Tr. at 269-274.  She opined

that Lavallee could lift and carry up to 10 pounds occasionally; sit for up to 8 hours without

interruption; stand for up to one hour without interruption; walk for up to 30 minutes; reach, handle, finger, feel, push/pull, and operate foot controls continuously; climb stairs and ramps, balance, stoop, and kneel occasionally; and otherwise engage in the ordinary tasks of daily living without undue difficulty.

Lavallee testified that while knee surgery had been recommended for her, she had not pursued it because she has no faith in surgery. Tr. at 32. In addition, she stated that although Synvisc injections had helped her knees in the past, she had not had an injection in almost a year. Tr. at 33.

### Mental Health Treatment

On May 10, 2007, Dr. Twarog met with Lavallee at the request of DDS and conducted a psychodiagnostic interview. Lavallee told Dr. Twarog that she had a history of depression and had felt suicidal on several occasions. Lavallee reported that she had been in and out of counseling, but had recently terminated the sessions because she could not drive the long distance to see her therapist. Although she had been prescribed a number of psychotropic medications, she stated that she had stopped taking them because she was having difficulty finding a primary care physician. Lavallee also told Dr. Twarog that her mood had stabilized and that she had been in better spirits over the last two years. Tr. at 231.

Dr. Twarog found that Lavallee was alert to person, place, and purpose; her speech was average with slight acceleration in volume and rate; her thought process was goal-directed and logical; and that she denied any current suicidal ideation, hallucinations, or paranoid thinking. Tr. at 232. While Dr. Twarog found Lavallee's mood "anxious" and

6

her affect "flat," he felt that her insight and judgment were adequate; she could spell "world" forward and backward; she could count backward from one hundred by sevens; and her recent and remote memory, as well as her ability to interpret proverbs, was intact. Id.

On May 24, 2007, Dr. McKenna, who did not personally examine Lavallee, completed a Mental RFC Assessment form based on a review of the medical records. Dr. McKenna determined that Lavallee was able to comprehend and recall simple information; she could complete ordinary tasks and sustain her work for two-hour increments over an eight-hour day; she was capable of adequate social interactions; and she was able to adjust to routine change. Tr. at 237.

In May 2008, Roderick referred Lavallee to Livingston for psychological counseling. Lavallee saw Livingston on two occasions, May 18 and June 5, 2008. Livingston diagnosed Lavallee with "PostTraumatic Stress Disorder, depression, and anger management" (stemming from a long history of mental health issues from Gender Identity Disorder and physical and mental abuse at an early age). On June 18, 2008, Livingston completed a Medical Source Statement (Mental) in which she concluded that Lavallee's impairment affected her capabilities by causing avoidant behavior, specifically with social interaction. Tr. at 266. Livingston noted Lavallee's limited attention span and impaired focus, as well as an "overly inclusive" manner of speaking. Id.

ALJ's Decision

The ALJ made the following findings in support of his decision following the

7

prescribed 5-step sequential analysis.[6]

At Step 1, the ALJ found that Lavalee had not engaged in substantial gainful activity since the alleged onset date, March 20, 2006.  At Step 2, he found that Lavallee had two severe impairments: degenerative joint disease in both knees and major depression; and that Lavallee's other alleged impairments, fibromyalgia, chronic fatigue syndrome, and carpal tunnel syndrome, were not severe.  (He found no medical evidence indicating that Lavallee had been diagnosed with any of these three impairments).  Tr. at 81-82. Determining that Lavallee's combination of impairments did not meet or equal an entry in the Listing of Impairments (Step 3), the ALJ turned to Lavallee's RFC (Step 4).  Tr. at 82. He determined that Lavallee could perform unskilled, sedentary work requiring up to eight hours of sitting and up to one hour of standing, provided that she had minimal contact with the public and co-workers.  Tr. at 83.  The ALJ held that, given Lavallee's RFC, she could not perform any of her past relevant work as a heavy equipment operator, tractor trailer driver, landscape laborer, blasting specialist, or security guard.  Tr. at 86.  At Step 5, the ALJ held that, in light of Lavallee's age (forty-five at the alleged onset date), education (high school graduate), work experience, and RFC, there were jobs in significant numbers in the national economy that Lavallee could perform.  Based on testimony from the vocational expert, the ALJ determined that Lavallee could work as a small parts inspector, weight tester, or data clerk.  Tr. at 86-87.  Therefore, he concluded that Lavallee was not disabled through the date of his decision, August 13, 2008.

## DISCUSSION

---

[6]The decision is set out verbatim in the Appendix.

This court's review of the Commissioner's decision is limited to determining whether the findings are supported by substantial evidence.    See 42 U.S.C. § 405(g); Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) ("We must uphold a denial of social security disability benefits unless 'the Secretary has committed a legal or factual error in evaluating a particular claim.'"), quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989).   The findings of the Commissioner will be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Rodriguez v. Sec'y of HHS 647 F.2d 218, 222 (1st Cir. 1981).

The Social Security Act defines disability as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  With regard to this definition, the Act explains that

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

Lavallee first complains that the ALJ failed "to give appropriate weight to [her] treating physicians' opinions in assessing the severity of her physical and mental impairments" and allotted "too much weight" to the consultative examination conducted by Dr. Howard "whose report is incomplete and of limited value." Under SSA regulations, an

ALJ must ordinarily give "more weight" to treating physicians' opinions, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(d)(2). However, the First Circuit "does not require ALJ's to give greater weight to the opinions of treating physicians" in all cases. Arroyo v. Sec'y of HHS, 932 F.2d 82, 89 (1st Cir. 1991), citing Tremblay v. Sec'y of HHS, 676 F.2d 11, 13 (1st Cir. 1982). An ALJ is entitled "to piece together the relevant medical facts from the findings and opinions of multiple physicians." Evangelista v. Sec'y of HHS, 826 F.2d 136, 144 (1st Cir. 1987). If the choice is supported by substantial evidence, the ALJ may prefer the opinion of a reviewing physician to that of a treating physician.[7] Arroyo, 932 F.2d at 89.

The ALJ determined that Lavallee could perform unskilled sedentary work requiring up to eight hours of sitting and up to one hour of standing. While acknowledging that Lavallee had bilateral knee degenerative joint disease that can cause pain and difficulty standing and walking, the ALJ credited the results of the MRI's taken of Lavallee's knees, noting that they showed less damage than the "bone on bone" condition Lavallee testified to during the hearing. Tr. at 32, 83. He also credited the portions of the Medical Source Statement completed by NP Roderick in which she found that Lavallee could sit for eight hours, stand for one hour, and walk for thirty minutes; that she could lift and carry up to ten

_____

[7]Under SSA's regulations, the expert opinions of medical reviewers may amount to substantial evidence where they represent a reasonable reading of the relevant medical evidence in its entirety. See 20 C.F.R. §§ 404.1527(f) and 416.927(f).

pounds occasionally; that she had no limitation in reaching, handling or fingering; and that she could occasionally perform most postural movements. Tr. at 84. In addition, the ALJ cited a progress note completed by Roderick, whose physical examination on one occasion did not support Lavallee's subjective complaints of fibromyalgia pain in her neck and shoulder. Tr. at 84. The ALJ gave weight to NP Roderick's opinions to the extent that they are "consistent with the adopted residual function capacity." Tr. at 85.

The ALJ also credited Dr. Mase's diagnoses of "bilateral knee pain as a result of osteoarthritis" and "positive crepitus and limited range of motion," and credited her complaints of pain in renewing her prescription of OxyContin. Tr. at 83. There is no evidence that the ALJ disregarded Dr. Mase's opinion. (Dr. Mase did not opine that Lavallee was disabled from performing sedentary work). While in noting Dr. Mase's October 20, 2005 report that Lavallee was "in good health," the ALJ mistated the date of his examination, it is clear from the opinion that this was merely a clerical error.[8] Tr. at 84. The ALJ found that Lavallee's "joint disease and depressions . . . are considered severe. Tr. at 81. However, the ALJ found it significant that Lavallee had undergone little treatment for her knees. Tr. at 84. "Surgery has been recommended but she does not believe in surgery." Tr. at 83.

With regard to Lavallee's mental health issues, the ALJ found that in activities of daily living Lavallee has mild restrictions. As to her social functioning and concentration,

---

[8]Lavallee dedicates a portion of her brief to a complaint that the ALJ mistakenly stated that she quit seeing Dr. Mase because of a dislike for her bedside manner (the ALJ's misunderstanding may stem from Lavallee's testimony that Dr. Mase is "the one I just got rid of"), and that Lavallee took large doses of narcotic pain medication. Neither of the alleged misstatements figure into the ALJ's determination of non-disability. Tr. at 84.

persistence and pace, the ALJ found Lavallee to have moderate difficulties.  While he noted Livingston's diagnosis of Lavallee with anger management, post traumatic stress disorder, and depression, he gave her opinions only limited weight because she is a licensed social worker and "not an acceptable medical source and further and most importantly has only treated [Lavallee] on two occasions at the time she completed the Medical Source Statement." Tr. at 85.  With regard to Dr. Twarog's report, the ALJ noted Lavallee's comments that while she had a history of depressive symptoms, "she felt much improved over the last two years due to her new wife." Id.  Moreover, Livingston reported that Lavallee "is quite clear that she chooses to lead a somewhat isolative life-style" and "chooses to remain quite apart from a larger community." Tr. at 260, 266.  See also Tr. at 49.

The ALJ further noted that Lavallee has never been psychiatrically hospitalized. While he accepted the fact that she was diagnosed with post traumatic stress disorder and major depression, Tr. at 85, a diagnosis of a mental or physical condition is not sufficient in and of itself to prove disability.  See Strickland v. Barnhart, 107 F. App'x 685, 688 (7th Cir. 2004) (absence of objective evidence to support a diagnosis of RSD); Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."); McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir.1986) ("[T]he 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality.").

Lavallee also objects to the ALJ's "over-reliance on the opinion of a consultative

examiner [Dr. Howard] whose report is incomplete and of limited value." Lavallee complains that Dr. Howard "had reviewed no treating sources medical records either prior to or at the time of his evaluation." App. Br. at 12. Lavallee also believes that "Dr. Howard's disregard of claimant's female gender implies at the least an insensitive nature, and at worst, this writer would suggest, a judgmental nature that may have influenced his evaluation. This attitude, when combined with his failure to consider claimant's medical records, renders the value of Dr. Howard's evaluation as negligible." Id. However, the ALJ's only mention of Dr. Howard is with respect to his finding that LaValee's healing was "essentially normal" and that she "appeared quite bright and was perhaps 15 -20 pounds overweight." Tr. at 84.

Lastly, Lavallee faults the ALJ for his determination that her "subjective complaints were not credible as supported by the medical evidence." Lavallee states that the ALJ misjudged her credibility and therefore disregarded her subjective complaints of pain. Lavallee testified at the hearing before the ALJ that she had pain in her knees that becomes "unbearable" with activity, and impacts her ability to walk up stairs. Tr. at 24, 36. She testified that her right knee is unstable and that it unexpectedly gives out, causing her to fall. Tr. at 33-34. Lavallee also recounted her "overuse" of her hands and arms while working causing carpal tunnel syndrome (now asymptomatic), and that she has generalized joint pain in her hips, lower back, ankles, and neck. Tr. at 35-38. She claimed that her ability to stand is limited to "a few minutes" at a time before pain and a "burning sense" in her lower extremity joints causes her to get off her feet. Tr. at 37. When watching television, Lavallee said that her "weak muscles [cause] shooting pains on both

sides of the neck." Tr. at 38.

With regard to her psychological symptoms, Lavallee states that the record supports her testimony that depression, anxiety, and post traumatic stress disorder have caused marked restriction of activities of daily living, social isolation, and marked difficulties with concentration, persistence or pace. Lavallee acknowledges that her treatment with Livingston was very limited; however, Lavallee argues that Livingston's opinions were based on a thorough and lengthy examination. Tr. at 266. She also argues that Livingston's diagnoses of post traumatic stress disorder and major depression are similar to the findings of Dr. Twarog, the agency examiner. Tr. at 230-234. Lavallee contends that Dr. Twarog expressed no reservations about her credibility. Tr. at 234. She also points out that Dr. Twarog found that her prognosis for work is "limited," a finding that was omitted from the ALJ's decision.

In his opinion, the ALJ recited all of Lavallee's preceding testimony regarding her joint disease and depression. He specifically noted that

> [t]he claimant alleges that she has a great deal of difficulty performing any activity due to a combination of medical impairment including degenerative joint disease and depression. The claimant testified that she served in the military reserves for several years and was a paratrooper and made hundred of jumps. Further she has always worked at heavy physical labor jobs. As a result she testified that her knees arc bone on hone and she has terrible pain and limitation as a result. She testified that she has undergone a series of synvisc injections with little improvement in her left knee. Surgery has been recommended but she does not believe in surgery. She testified that just recently she fell when her left knee gave out on her. She reported that she has great difficulty walking and standing for a prolonged period of time due this condition. Further she testified that after she does things she is in severe pain.

Tr. at 83. However, the ALJ found that the Lavallee's testimony as to her impairments and

their impact on her ability to work were "considerably more limited and restricted than is established by the significant medical evidence of record" and for this reason he found that she was not fully credible.

Many of Lavallee's complaints are not supported by her medical records. Radiological studies of her left knee reveal a large radial tear of the medial meniscus with early medial compartment degenerative changes. Studies of the right knee indicate varus deformity with a tiny medial meniscus tear. Neither of these studies indicates bone on bone findings. When the ALJ asked Lavallee why she could not work, she responded that chronic fatigue kept her from "waking up on time" and she would miss work or was consistently late. Tr. at 55. Despite her complaints of fatigue, migraine headaches, and hand pain, Lavallee has never been diagnosed with chronic fatigue syndrome or carpal tunnel syndrome. While the ALJ believed that Lavallee experienced some psychiatric symptoms, he found that they are not so severe as to erode her ability to do sedentary unskilled work.

The credibility of a claimant is for the Commissioner to determine, so long as the determination is explained by substantial evidence. Acevedo Ramirez v. Sec'y of HHS, 550 F.2d 1286 (1st Cir. 1977); Musto v. Halter, 135 F. Supp. 2d 220, 226-227 (D. Mass. 2001). While the ALJ must consider a claimant's subjective complaints of pain, he is not required to accept them at face value. Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 22-23 (1st Cir. 1986); 20 C.F.R. § 404.1529. He must, however, state specific reasons for questioning a claimant's credibility. DaRosa v. Sec'y of Health & Human Servs., 803

15

F.2d 24, 26 (1st Cir. 1986).[9]  This the ALJ has done, and at sufficient length.  This is all that is required.

ORDER

For the foregoing reasons, Lavallee's Motion to reverse the decision of the Commissioner is <u>DENIED</u>.  The Commissioner's cross-motion for an order of affirmance is <u>ALLOWED</u>.  The Clerk will enter the appropriate order and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

[9][A] Court will not save [a] decision by inserting the basis for a finding where there was not substantial evidence to support it and no specific finding justifying it as a rational result." <u>Rohrberg v. Apfel</u>, 26 F. Supp. 2d 303, 310 (D. Mass. 1998).

## APPENDIX

1.  The claimant meets the insured status requirements of the Social Security Act through  March 31, 2010.

2.  The claimant has not engaged in substantial gainful activity since March 20, 2006, the  alleged onset date (20 CFR  404.152(l(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3.  The claimant has the following severe impairments: degenerative joint disease in both  knees and major depression (20 CFR. 404.1520(c) and 416.92(c).

4.   The claimant does not have an impairment or combination of impairments that meets  or medically equals one or the listed impairments in 20 CFR Part 404. Subpart P,  Appendix 1 (20 C.F.R. § 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the  claimant has the residual functional capacity to perform sedentary work as defined in 20  C.F.R. § 404.1567(a) and 416.967(n) except the claimant can sit for up to 8 hours and stand for up to 1 hour.  Further the claimant is frequently unable to understand, remember and  carry out complex and detailed work.  Therefore the claimant is limited to unskilled work.  Further the claimant can have minimal contact with the public and co-workers.

6.  The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565 and  416.965).

7.  The claimant was born on April 19,1960 and was 45 years old, which is defined as a  younger individual age 18-44, on the alleged disability onset date (20 C.F.R. § 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in  English (20 C.F.R. § 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because  using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and  20 C.F.R. § Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. § 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from March 20, 2006 through the date of this decision (20 C.F.R. § 404.1820(g) and 416.920(g)).

12.   Although the Federal Reviewing Official's decision was not considered to be evidence, the undersigned does not agree with the conclusion on disability or all the substantive findings the FedRO made on the Title II and Title XVI claims (20 C.F.R. § 405.370).